UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LYDIA LOVERING, | ) |
| | ) |
|      Plaintiff, | )     Case No. 1:24-CV-00062-LM-AJ |
| | ) |
|      v. | ) |
| | ) |
| BREWSTER ACADEMY, | ) |
| | ) |
|      Defendant. | ) |
| | ) |

**LYDIA LOVERING'S OBJECTION TO DEFENDANT
BREWSTER ACADEMY'S MOTION TO DISMISS**

### i.      Introduction

In a continued effort to avoid facing the reality that an elite private school neglected and abandoned its 15-year-old student in a remote, foreign island during an impending global pandemic, Defendant Brewster Academy ("Brewster") seeks to shield itself from its clear liability. Brewster failed to exercise its duty of care owed to its 15-year-old student and allowed its minor students to have sole control over a critical travel document (passport) during a winter semester abroad. Predictably, then 15-year-old Plaintiff Lydia Lovering ("Lydia")[1] misplaced her passport while she was in Brewster's care in Tenerife. Lydia then could not travel back to the United States with her Brewster group. Brewster deserted Lydia in Tenerife while the rest of her class traveled home as COVID-19 spread rapidly in Spain. Lydia returned home to the United States shortly thereafter only because her mother immediately traveled to Spain to retrieve her daughter. The post-traumatic stress disorder caused by Brewster abandoning its responsibilities to her while she was in Brewster's care continues to this day.

---

[1] To avoid confusing among the members of the Lovering family members, after their introduction, this objection will refer to them using their given names.

Now, Brewster ignores well-established New Hampshire law and attempts to avoid liability for its actions relying on an unenforceable document, the "Waiver and Release" (hereinafter "Release"), which it seeks to impose on Lydia, who was only 15 when the document was executed. Brewster should not be permitted to do so and for the reasons set forth below, the Court should deny Brewster's motion.

## ii.       Relevant Factual Background

### A.  *Brewster Academy and its Global Program.*

Brewster is an elite private secondary school in New Hampshire. *See Complaint*, ¶ 2. In the 2019-2020 school year, Brewster offered its students an opportunity to study in the Canary Islands, specifically Tenerife, known as the "Brewster Global Program" (hereinafter "Global Program") *Id*., ¶ 8. This was the second time that Brewster offered the Global Program, and the first time in the Canary Islands. *Id*., ¶ 10. In addition to paying Brewster's yearly tuition, Lydia and her family paid a "Program Fee" for her to attend the Global Program. *Id*., ¶ 13.

Prior to flying to Tenerife, Brewster required the Brewster Global Program participants to email Brewster a copy of the students' passports, and the Loverings complied. *Complaint*, ¶¶16-17. Lydia flew overseas with the rest of the Global Program participants on January 6, 2020. *Id*., ¶ 18. At the time of the Tenerife trip, Lydia was 15 years old and had never traveled to a foreign country. *Id*., ¶ 19.

Brewster permitted Lydia to physically possess her passport, yet there was never a time where the Global Program was expected to leave Tenerife. *Complaint*, ¶¶ 20, 23. Lydia stayed with a local host family and not in a dorm or school-like setting during the Global Program. *Id*., ¶ 22. Rather than simply taking custody of the passports of the minor students in its care, Brewster used fear and intimidation in hopes of compelling the students participating on the trip to take care of their own passports by (incorrectly) telling the minors that if their passports were

2

misplaced they could only get to Madrid, and from there back to the U.S., via a multi-hour cargo/freight ship. *Id.*, ¶ 21.

### B.  Lydia's Passport is Misplaced; Brewster Leaves Lydia Behind.

On January 30, 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a global health emergency. *Complaint*, ¶ 24. On February 24, 2020, an Italian doctor vacationing in Tenerife tested positive for COVID-19 ("the February 24th COVID-19 case"); and there were a total of four confirmed positive cases in Tenerife on that date. *Id.* On Tuesday, February 25, 2020, parents of Brewster students were notified of the February 24th COVID-19 case in Tenerife and of Brewster's commitment to keeping students safe, and the very next day, Wednesday, February 26, 2020, parents were notified that Brewster was going to remove students as soon as possible due to COVID-19 and that the students would be returning to the United States on Saturday, February 29, 2020. *Id.*, ¶¶ 24-26.

Brewster made no efforts to ensure all the students possessed their passports between Wednesday, February 26th and Friday, February 28th during the business hours of the American embassy in Spain. *See Complaint*, ¶¶ 26-27. It was not until the evening of February 28th (Spain local time) when the Brewster chaperone texted the students requesting each to send him a picture of their passport, to demonstrate they actually had custody of the travel document. *Id.*, ¶ 28. Lydia began searching and could not find her passport and promptly informed the Brewster chaperone. *Id.*, ¶ 29. Lydia was told she could not fly back to the United States with the rest of her classmates and based on prior representations by Brewster, Lydia understood she would have to take a cargo/freight ship back to Madrid (unsupervised by Brewster personnel), and it could be almost a week before she would be able to return to the United States and her family. *Id.*, ¶ 30.

4872-1342-5850, v. 3

### C.  *Lydia Begins Panicking and Calls Home.*

Lydia informed her mother later in the evening on February 28th—based on representations from Brewster—that she could not find her passport, and as a result she could not fly to Madrid, and that she might have to take a 24-hour cargo ship to Madrid with an Embassy employee (which is what she then believed based on statements made by Brewster's chaperone) and at the time of the call there was no apparent plan developed by Brewster for Lydia. *Complaint*, ¶ 34. Due to Brewster's inaction, Lydia's mother, Jane, took action and booked a flight to Madrid scheduled to arrive on March 1st. *Id*., ¶ 43. Jane learned—contrary to Brewster's representations—that Lydia could in fact have flown from Tenerife to Madrid without her physical passport. *Id*., ¶ 44. During this time waiting for her mother, Lydia was abandoned by her school and classmates; she was contacted only once via text by one of the teachers Brewster hired in Tenerife. *Id*., ¶ 41.

Separately, on February 28th, Lydia's father, Jay Lovering, contacted Brewster and was told, in part, that "[Lydia] is going to have to suck it up until Monday until the American Consulate opens." *Complaint*, ¶ 38. The next day, after Brewster had already left Lydia behind, Brewster informed Jay that Brewster "left [Lydia] with her 2 Brewster teachers in charge of her", Mar Gonzalez and Cristina Villaverde. *Id*., ¶ 39. Jane Lovering arrived in Tenerife and Lydia was not herself. *Complaint*, ¶ 46. After obtaining an emergency passport, Lydia and Jane returned back to the United States before Spain's State of Alarm stemming from COVID-19 went into effect on March 14, 2020. *Id*. Lydia was not the same the rest of the school year. *Id*., ¶¶ 47-59. While the state of emergency surrounding the pandemic caused mental health problems in adolescents and teens over time, arising out of prolonged isolation, Lydia experienced immediate and dramatic mental health and emotional trauma both in Tenerife and after her return to her home on Nantucket that persists today.  *Id*., ¶ 51.

4

Due to the pandemic, securing appropriate treatment and services for Lydia was extremely difficult and stressful. She was taken to an emergency room in Massachusetts where she stayed for four (4) nights while she was waiting for an available bed at Boston Children's Hospital's Community Based Acute Treatment ("CBAT") program in Waltham, Massachusetts to address the most immediate presentation of her mental health issues triggered by Brewster's negligence: an eating disorder. Lydia remained in the CBAT program for two (2) weeks. *Complaint*, ¶ 52. Eventually, her family secured a spot in Connecticut for Lydia to receive in-patient treatment, and this required Jane to quit her job and to relocate to Connecticut so she could oversee Lydia's care and separated Jane from her son for long periods, who remained in Nantucket with his father. *Id*., ¶¶ 53-54. Lydia was given numerous mental health diagnoses and treated for depression, Bipolar II Disorder, anxiety and mood disorders, and she continues to suffer from post-traumatic stress disorder caused by her abandonment by Brewster in Spain at the onset of the pandemic. *Id*., ¶ 55.

Lydia was unable to return to Brewster, and she graduated high school one year behind her peers because of the injuries she suffered from Brewster abandoning her. *Complaint*, ¶ 58. She continues to suffer from post-traumatic stress disorder; she requires medication to allow management of her mental health; and the impacts of Brewster's unlawful actions continue to impact her daily activities. *Id*. She timely brought this lawsuit after she reached the age of majority and effectively repudiated any document Brewster compelled her to sign as a minor.

For these reasons and those set forth below, the Court should deny Brewster's motion.

### iii.    Argument

#### A.  *Applicable Legal Standard.*

"To defeat a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must include in his complaint factual allegations sufficient to 'state a claim to relief that is plausible on

its face[...]' A claim is facially plausible if it pleads 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Chalifoux v. Proto Labs, LLC*, No. 23-CV-23-SE, 2023 WL 9375622, at *1 (D.N.H. Dec. 28, 2023) (Johnstone, J.), report and recommendation adopted, No. 23-CV-23-SE, 2024 WL 245040 (D.N.H. Jan. 23, 2024) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The court's assessment of plausibility is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *See Aboussa v. New Hampshire*, No. 22-CV-284-LM, 2023 WL 6317936, at *1 (D.N.H. Sept. 28, 2023) (McCafferty, J.) (internal citations and quotations omitted).

### B. Lydia Repudiated the Release by Filing this Lawsuit.

*Harrigan v. New England Dragway, Inc.*, No. CV 13-10132-JCB, 2014 WL 12589625, at *1 (D. Mass. Jan. 2, 2014) (Boal, M.J.) makes clear that "[i]n New Hampshire, a minor who enters into an agreement may repudiate that agreement at any time before reaching majority or within a reasonable time thereafter… The party may effectuate repudiation by filing suit to disavow the agreement." *Harrigan,* 2014 WL 12589625, at *5. In *Harrigan*, the defendant conceded that the minor repudiated the Release through timely filing suit. Here, the same concept applies. Lydia repudiated the Release invoked by Brewster through filing this lawsuit timely after she reached the age of majority. *See Complaint,* ¶ 59; *see also* N.H. Rev. Stat. § 508:8 (2017).[2] Consequently, since Lydia repudiated the Release through filing this lawsuit, Brewster cannot rely upon the Release signed by Lydia when she was 15 years old (or by her mother as discussed in subsection D below) to dismiss this action.

---

[2] Which provides, "[a]n infant or mentally incompetent person may bring a personal action within 2 years after such disability is removed." New Hampshire recognizes one reaches the majority age when they turn 18. *See* N.H. Rev. Stat. § 21-44 ("Notwithstanding any provision of law to the contrary, the words "adult", "majority", "age of majority", "full age or lawful age", and all other terms of referring to those persons who are to be considered adults, shall mean those persons who have attained the age of 18 years.").

### C. *Brewster and Lydia Had a Special Relationship at All Relevant Times.*

Separately, Brewster's special relationship with Lydia bars enforcing the Release. During the relevant time period, Lydia was a boarding student and under Brewster's care. *Complaint*, ¶¶ 6, 11, 61. "In New Hampshire, exculpatory contracts are generally prohibited." *See Barnes v. New Hampshire Karting Ass'n*, *Inc*., 128 N.H. 102, 106 (1986). "**A defendant seeking to avoid liability must show that the exculpatory agreement does not contravene public policy; i.e., that no special relationship existed between the parties** and that there was no other disparity in bargaining power." *Id*. (emphasis added). Based on the special relationship between Brewster and Lydia, since Lydia was a student in Brewster's care both domestically and abroad, the Release contravenes public policy and cannot be enforced.

Brewster—Lydia's educational provider and entity responsible for her care—enjoyed a "special relationship" at all relevant times. "[S]chools share a special relationship with students entrusted to their care, which imposes upon them certain duties of reasonable supervision." *See Marquay v. Eno*, 139 N.H. 708, 717 (1995) (internal citations omitted).[3] With respect to minors in particular, and boarding students especially, a school sits *in loco parentis* and assumes the duties of a parent or guardian. *See Franchi v. New Hampton Sch.*, 656 F. Supp. 2d 252, 263 (Laplante, J.) (D.N.H. 2009) ("[a]s a matter of law… the nature of the duty owed from NHS—a secondary school—to [the minor] was a duty of care arising out of its in loco parentis status as in *Marquay*[.]") (emphasis supplied). "The scope of the duty imposed is limited [only] by what risks are reasonably foreseeable." *Id*. Lydia's parents entrusted Brewster with their 15-year-old's

---

[3] Where the Court also stated:

> Because, however, **it is the school to which parents turn over custody of their children and from which they expect safety** and because the superintendent and principal are charged with overseeing all aspects of the school's operation, **we hold that a duty of supervision is owed to each student**.

*Id*. at 280 (emphasis added).

care during the school year and trip abroad. Brewster cannot seriously contend it had no duty of reasonable supervision over Lydia during the Global Program. Further, Lydia alleges that Brewster did not exercise its responsibility for her with reasonable care by entrusting her passport—a critical travel document—to her sole custody through use of a fear tactic. That a minor would misplace the document was plainly reasonably foreseeable, which is why Brewster asked each of the trip participants to confirm they had their passports by texting a photo to their chaperone late on the evening before they were due to fly out of Tenerife. *See Complaint*, ¶ 28. Under applicable law, Brewster cannot rely on the Release due to the existence of this special relationship. *See Barnes*, 128 N.H. 102 at 106.

### D.  Other Courts Have Refused to Enforce Comparable Releases Executed by the Parent on Behalf of the Minor Child.

Since Lydia repudiated the Release, the remaining issue is whether Lydia's mother's execution of the Release bars Lydia's claim. It does not. New Hampshire law generally does not condone exculpatory contracts, *see Barnes*, 128 N.H. at 106, let alone the pre-injury release of, waiver of, or indemnity for liability for injuries to minor children. The few cases considering this issue of parental pre-injury releases on behalf of minors have consistently held that such exculpatory provisions are not enforceable under New Hampshire law.  *See Perry v. SNH Dev., Inc.*, Hillsborough Superior Court No. 2015-cv-00678 (Sept. 13, 2017) (Temple, J.) (declining to enforce pre-injury waiver as to claim by minor) ("*Perry*")[4]; *McKenna v. Am. Inst. for Foreign Study Scholarship Found.*, Civil No. 94-671-B (D.N.H. Sept. 12, 1997) (Barbadoro, J.) (same) ("*McKenna*")[5]; *see also Harrigan,* 2014 WL 12589625.[6]

---

[4] A copy is attached hereto as *Exhibit A*.

[5] A copy is attached hereto as *Exhibit B*.

[6] *Harrigan* is not the "only legal authority on the validity of an exculpatory agreement entered into on behalf of a minor in New Hampshire[.]" (ECF No. 6, p. 8).

In *McKenna*, Judge Barbadoro held that a mother's prospective release on behalf of the minor plaintiff was unenforceable. Finding no controlling New Hampshire law on point, Judge Barbadoro reviewed the holdings of other jurisdictions and stated that "almost all have concluded that pre-injury releases signed by a parent do not bar a child's actions for personal injury absent contrary statutory provisions." *Exhibit B*, *McKenna*, at 7-8. Judge Barbadoro also relied on a New Hampshire Supreme Court decision, *Roberts v. Hillsborough Mills*, 85 N.H. 517, 518-519 (1932), which held that a "parent's decision to give up a child's cause of action in exchange for worker's compensation payments is not binding under the Workers' Compensation Act." *Exhibit B*, *McKenna* at 8. Judge Barbadoro, relying on other jurisdictions' general rule that a parent cannot release claims on behalf of their minor in post-injury settings absent statutory authority, stated that "[s]ince a parent may not release a child's cause of action **post-injury** without court approval, it makes little sense to conclude that the parent should have that authority **before the injury occurs**." *See Exhibit B, Mckenna* at 8 (internal citations omitted) (emphasis added). Ultimately, as to the minor plaintiff's claims, Judge Barbadoro concluded:

> Based on the holding in <u>Roberts</u>, New Hampshire's general public policy disfavoring exculpatory agreements, and the weight of authority from other jurisdictions, **I conclude that the New Hampshire Supreme Court would hold that the pre-injury release** signed by Marsha McKenna **is unenforceable against her son's claims**.

*Id*. at 9. (emphasis added). This analysis is on point, and there has been no New Hampshire Supreme Court decision to the contrary since *McKenna* was decided. The Court here should dispose of Brewster's arguments in the same way by denying the motion to dismiss.

More recently in *Perry*, New Hampshire's Hillsborough Superior Court, Southern District declined to enforce a prospective waiver of rights signed by a parent on behalf of their minor child stating, "New Hampshire law is clear that [the parent] lacked the authority to waive [the

minor's] prospective negligence claims." *Exhibit A*, *Perry* at 10. Judge Temple relied on New Hampshire law for the proposition that, "[g]enerally speaking, a parent cannot waive the substantive rights of a minor child[;]"[7] and that "[u]nder New Hampshire law, 'there are only two recognized ways in which a minor may take binding action in the enforcement or discharge of his legal rights, namely, through a duly appointed guardian acting within his powers, or through his next friend by proceedings in court[…]' **If neither one of those procedures are employed, then a parent has 'no authority to bind the [minor],' and the minor has a 'legal right to repudiate the' parent's action.**" *Perry* at 10-11 (emphasis added) (*citing Roberts*, 85 N.H. 517 at 519; *Merchs. Mut. Cas. Co. v. Kiley*, 92 N.H. 323, 325 (1943); *White v. Boulia-Gorrell Lumber Co.*, 85 N.H. 543, 543 (1932)[8]). Judge Temple concluded in *Perry*:

> In the Court's view, <u>Roberts</u> conclusively establishes that [the mother] lacked the authority to waive [the minor's] prospective legal rights. [The mother] was not appointed as a guardian ad litem by any court, nor were there ongoing legal proceedings at the time the Release was signed. Likewise, SNH has pointed to no statutory provision authorizing [the mother] to sign the Release in question. As such, under <u>Roberts</u>, [the minor] could repudiate the Release, and did so when she brought this "action at law through [her] next friend." *Roberts*, 85 N.H. at 519. Accordingly, the Court finds that the Release does not bar any of [the minor's] claims.

*Exhibit A, Perry* at 11. *Perry* provides further persuasive guidance. The pre-injury Release signed by Jane is unenforceable against Lydia's claims since Jane was never a duly appointed guardian acting within her powers or as Lydia's next friend in court proceedings.

Defendants rely solely on *Harrigan v. New England Dragway, Inc.*, No. CV 13-10132-JCB, 2014 WL 12589625, at *1 (D. Mass. Jan. 2, 2014) (Boal, M.J.)*, but the Court in *Harrigan*

---

[7] *Citing State ex rel. Fabian v. Fabian*, 116 N.H. 516, 518 (1976) ("[g]enerally speaking, a parent cannot waive the substantive rights of a minor child.") (internal citations omitted).

[8] Where the Court stated, "[t]he plaintiff was a minor at the time of the accident. A release of all demands against the defendant was executed by the plaintiff's father, who signed the release as the plaintiff's 'next friend.' This instrument is not a bar to the action." *White*, 85 N.H. at 543 (*citing Roberts*, 85 N.H. at 517).

did not uphold the release and so the case does not support its position. In *Harrigan*, the District of Massachusetts (Boal, M.J.) stated, "the Court is persuaded that the New Hampshire Supreme Court would find the Minor Release Agreement, to the extent it purports to bar [the minor's] claims here, to be contrary to public policy." *Harrigan*, 2014 WL 12589625, at *7. The court even stated that "[t]he vast majority of analogous state court decisions have held that agreements such as the Minor Release Agreement are unenforceable against a minor because they are contrary to public policy." *See Harrigan*, 2014 WL 12589625, at *6 (internal citations omitted). Similar to *McKenna*, *Harrigan* looked to New Hampshire's statute preventing parents from settling a minor's claim without court approval post-injury—N.H. Rev. Stat. § 464-A:42[9]—as evidence that New Hampshire public policy does not support enforcement of pre-injury waivers. *Id*., 2014 WL 12589625, at *8.

Brewster's reliance on dicta in *Harrigan* to argue a different outcome is warranted due to Brewster's status as a non-profit organization is unavailing.[10] *Harrigan* cited *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St. 3d 367, 374, 696 N.E.2d 201, 206-207 (1998) when observing that a minority of states with decisions upholding a parent's "pre-injury exculpatory agreement on behalf of a minor child" have done so "primarily on the basis that the defendant is a government or non-profit sponsor of the activity." *Harrigan*, 2014 WL 12589625, at *7. Notwithstanding that this is only a <u>minority</u> view, and that no New Hampshire case – state or federal – has adopted such a view in any setting, the Court should not presume the Supreme Court of New Hampshire

---

[9] Which states in relevant part, "[s]ettlements, judgments, or decrees of any suit or claim brought on behalf of a minor by a parent or next friend shall be approved by the superior or district court in which the action is pending[.]

[10] The Complaint does not allege that Brewster is a non-profit corporation and Brewster raises it in the Motion. *See Complaint*, ¶ 2. A review of Brewster's corporate filings in New Hampshire establishes it is a domestic non-profit corporation demonstrating subject matter jurisdiction in connection with the Court's recent Order [ECF No. 17]. Nonetheless, Brewster goes outside the four corners of the Complaint raising this in its Motion to Dismiss, and by addressing this argument on its merits, Lydia does not waive her objection to it doing so.

would adopt this minority view under the facts alleged. *Zivich* involved an exculpatory agreement with a soccer club that was a "nonprofit organization that provides children… with the opportunity to learn and play soccer. **The Club [was] primarily composed of parents and other volunteers who provide their time and talents to help fulfill the Club's mission**." 82 Ohio St. 3d 367, 696 N.E.2d 201 (emphasis added). The Complaint makes no allegations that Brewster is run by volunteers who are not paid for their efforts, and indeed, as a private school offering its students a study abroad program, the only inference to be drawn at this stage is quite to the contrary. As Brewster invokes its non-profit status, the Court may and should consider (or allow Plaintiff to amend to allege) Brewster's publicly available Form 990s which show that in 2020 (the year Lydia traveled to Tenerife), Brewster had 290 employees and over $46 *million* in assets. Brewster is not a volunteer sports club run by parents for free; it is an elite private school. *See Exhibit C*.[11] [12] While there may be valid public policy reasons to not wipe out valuable after-school enrichment activities that are purely volunteer driven, Brewster does not require such a rule to continue its existence. *Zivich* is inapposite to the present set of facts, and to date, New Hampshire law has recognized no public policy need for such an exception to the general rule applied in the cases cited by both parties under which the Release is not enforceable here. This is not a case that requires a new exception to be made to the general rule that pre-injury exculpatory provisions are not enforceable as to minors.

---

[11] The Court may consider Brewster's publicly-available tax filings. When evaluating a motion to dismiss, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." *R.G. Fin. Corp. v. Vergara-Nuñez*, 446 F.3d 178, 182 (1st Cir. 2006). The court may also consider **"documents the authenticity of which are not disputed by the parties,"** official public records, documents central to the plaintiff's claim, and documents sufficiently referenced in the complaint. *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993).

[12] The 2020 Form 990 also indicates that Brester maintained "an office, employees or agents outside of the United States" seemingly indicating that Brewster utilized employees and not volunteers in Tenerife. Nonetheless, that is an issue better suited for discovery rather than through resolution of a motion to dismiss.

#### iv.    Conclusion

For the reasons set forth above, Lydia Lovering respectfully requests that the Court deny

Brewster Academy's motion to dismiss in its entirety.


Respectfully submitted,
LYDIA LOVERING
By her Attorneys,

*/s/ Joseph M. Cacace*
Joseph M. Cacace, N.H. Bar # 266082
Todd & Weld LLP
One Federal Street
Boston, MA 02110
(617) 720-2626
jcacace@toddweld.com

Megan C. Deluhery, MA BBO # 655564
William E. Gildea, MA BBO # 699112
*Admitted pro hac vice 4/11/24*
Todd & Weld LLP
One Federal Street
Boston, MA 02110
(617) 720-2626

Dated:  May 3, 2024                                          mdeluhery@toddweld.com
wgildea@toddweld.com


### CERTIFICATE OF SERVICE

I, Megan C. Deluhery, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Megan C. Deluhery*
Megan C. Deluhery

Dated:  May 3, 2024

4872-1342-5850, v. 3