# Exhibit A

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Hillsborough Superior Court Southern District
30 Spring Street
Nashua NH  03060

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**File Copy**

___Case Name:    **Jean Elizabeth Perry, et al v SNH Development, Inc.**
Case Number:    **226-2015-CV-00678**

Enclosed please find a copy of the court's order of September 13, 2017 relative to:

ORDER ON DEFENDANT'S MOTION  FOR SUMMARY JUDGMENT

September 14, 2017

Marshall A. Buttrick
Clerk of Court

(564)

C: Israel Francisco Piedra, ESQ; Thomas B.S. Quarles, Jr., ESQ; Brendan P. Mitchell, ESQ

THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS.**                                          **SUPERIOR COURT**
**SOUTHERN DISTRICT**                                        **No. 2015-CV-00678**

Jean Elizabeth Perry; Thomas Perry; and
Sarah Jean Perry b/p/n/f Jean and Thomas Perry

v.

SNH Development, Inc. d/b/a Crotched Mountain Ski Area and
Crotched Mountain Ski and Ride Area

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The plaintiffs, Jean Elizabeth Perry ("Jean"), Thomas Perry, and Sarah Jean

Perry ("Sarah") have brought this complaint seeking damages related to a chair lift

accident at a New Hampshire ski mountain owned and operated by the defendant, SNH

Development, Inc. ("SNH") d/b/a Crotched Mountain Ski Area and Crotched Mountain

Ski and Ride Area.  SNH now moves for summary judgment, to which the plaintiffs

object.  The Court conducted a hearing on this matter on July 5, 2017, at which all

parties were represented by counsel.  After considering the pleadings, the arguments,

and the applicable law, the Court finds and rules as follows.

Background

The record reveals the following facts viewed in the light most favorable to the

plaintiffs.  On December 11, 2013, Jean, her mother Paula Lalime ("Paula"), and her

daughter Sarah, were at Crotched Mountain, a commercial ski establishment owned

and operated by SNH.  Sarah was six years old at the time.  Prior to skiing, Jean and

Sarah obtained season passes for the 2013-2014 winter season.[1]  In order to obtain

---

[1] Paula was a volunteer member of the Crotched Mountain ski patrol and received a "season's pass for
family members for her duties on ski patrol." (Def.'s Mot. Summ. J. Ex. 1 ¶ 20.) Jean paid her mother
$50 to take advantage of the family pass. (Id.) It is unclear if Jean and/or Sarah also paid a fee to SNH.

season passes for herself and Sarah, Jean was required to sign two documents, each

entitled "SEASON PASSHOLDER ACCEPTANCE OF RISKS AND LIABILITY

RELEASE AGREEMENT" (hereinafter the "Release" or "Releases"). (Def.'s Mot.

Summ. J. Ex. 3A.)  The Release provides, in pertinent part:

> ACCEPTANCE OF RISKS:  All forms of alpine activities such as skiing and snowboarding, including the use of lifts, are hazardous. . . .
>
> As a season passholder, I acknowledge the risk of injury or death due to continually changing weather, visibility, surface conditions and other inherent risks . . . .
>
> **LIABILITY RELEASE AND PARENTS' INDEMNIFICATION FOR MINORS:**  As a condition of being permitted to use the ski area premises, **I hereby agree to RELEASE from liability** any ski area where this pass is valid, including . . . SNH Development, Inc. d/b/a Crotched Mountain Ski and Ride . . . (hereinafter **the "Ski Areas"**) as I freely and voluntarily accept all risks of injury, death or property damage occurring on any of these Ski Area's premises.
>
> **I agree,** for myself and/or my child, to **RELEASE, indemnify, defend, and hold harmless the Ski Areas** from liability for any and all loss or damage to myself or to my child or my or my child's property resulting **from the Ski Areas' NEGLIGENCE, including but not limited to the risks described above, in the operation, maintenance or design of the Ski Areas and from my participation in any activities at the Ski Areas, even if those activities are unrelated to alpine activities.**  I understand that the Ski Areas are not responsible for the consequences of their own **NEGLIGENCE**, that is, their failure to use reasonable care in any way.  I acknowledge that I am freely and expressly assuming and accepting any and all risks of property damage, personal injury and death in connection with my or my child's use of the Ski Areas premises . . . .
>
> . . .
>
> **This Release of Liability Agreement must be agreed to and signed to process order.**
>
> I acknowledge that I have read and understand the terms of this document and that I am signing it freely and voluntarily.

(Id. (emphases in original).)  Jean signed one Release for her herself and one on behalf

of Sarah as her parent.  Both Releases are dated December 11, 2013.

After obtaining the season passes, Jean, Sarah and Paula began to ski.  Late in the afternoon, all three women attempted to board a detachable quad chair lift, known as the "Rocket," to ascend the mountain.  In the loading area, a Crotched Mountain employee began speaking with Sarah.  Sarah became distracted and was not in the proper position to board the chair lift.  Specifically, Sarah was facing sideways as the chair approached her, and one of her skis was crossed with Paula's skis.  When the chair arrived, it bumped into Sarah's side, causing her entire body to turn and face the chair.  Because Sarah was facing the chair, instead of having her back to it, Sarah could not sit down as the chair progressed through the loading area.  In order to prevent the chair from running over Sarah, Jean and Paula grabbed Sarah's jacket in an attempt to pull her on to the chair.

Jean and Paula began screaming for help once it was clear that Sarah was not seated properly.  Crotched Mountain employees, however, were not observing or monitoring the lift.  As a result, the employees failed to activate the "STOP" button and did not respond to the cries for help.  Instead, the chair lift rapidly ascended up the mountain.  Sarah dangled from the chair as Jean and Paula attempted to hold on to her to prevent her from falling.  Jean and Paula continued to scream for assistance as the chair lift ascended.  As noted above, Paula was a member of the ski patrol, and radioed for help using her free hand.  However, before Sarah could be rescued, she slipped from the grasps of her mother and grandmother.  Sarah fell approximately thirty to thirty-five feet to the ground near lift tower number six.  Fearing that Sarah had been seriously injured, Jean immediately jumped from the chair in an attempt to assist her daughter. Both Sarah and Jean were seriously injured as a result of their falls from the chair.

Sarah, Jean, and Mr. Perry (Sarah's father and Jean's husband), have since initiated this action for negligence, negligent supervision, gross negligence, recklessness, negligent infliction of emotional distress, violation of RSA 225-A:25, and loss of consortium.  SNH now moves for summary judgment, arguing that all of the plaintiffs' claims are barred by the Releases.  In response, the plaintiffs maintain that the Releases: (1) are unenforceable on public policy grounds; (2) do not apply to injuries arising from ski lift operations; and (3) do not cover reckless conduct.

Standard of Review

The Court decides summary judgment motions by considering "all of the evidence presented in the record, and all inferences properly drawn therefrom, in the light most favorable to the non-moving party."  Eldridge v. Rolling Green At Whip-Poor-Will Condo. Owners' Ass'n, 168 N.H. 87, 90 (2015) (quotation omitted).  "If this review does not reveal any genuine issues of material fact, i.e., facts that would affect the outcome of the litigation, and if the moving party is entitled to judgment as a matter of law" then summary judgment is proper.  Mbahaba v. Morgan, 163 N.H. 561, 568 (2012) (citation omitted); see also RSA 491:8-a, III.

Analysis

I.  RSA 225-A Claims

RSA 225-A:25 provides passengers a statutory cause of action against ski lift operators when they are injured as a result of violations of certain safety regulations. See, e.g., Ford v. Black Mountain Tramways, 110 N.H. 20, 22 (1969); Nutbrown v. Mount Cranmore, Inc., 140 N.H. 675, 678 (1996).  A statutory "claim for improper operation requires proof of a [ ] violation of the statute or of the rules of the tramway

safety board" ("the board") and that such violation caused the plaintiffs' alleged injuries. Cowan v. Tyrolean Ski Area, 127 N.H. 397, 403 (1985). In this case, the plaintiffs allege that SNH and/or its employees failed to comply with several regulations adopted by the board. For instance, ANSI Regulation B77.1-2011 § 3.3.2.3 states: "The duties of an attendant include . . . to monitor the passengers' use of the aerial lift; including observing, advising and assisting them while they are in the attendant's work area as they embark on or disembark from the aerial lift; and to respond to unusual occurrences or conditions." (Compl. ¶ 164.) As a result of this breach, the plaintiffs have filed a statutory claim pursuant to RSA 225-A:25, I. (See generally id. ¶¶ 157–175 (Count VI).)

SNH argues that the plaintiffs' RSA 225-A statutory claims are barred by the plain language of the Releases. For their part, the plaintiffs maintain the Releases are unenforceable as to any statutory claims because RSA 225-A "imposes certain duties upon both skiers and ski areas as part of a comprehensive regulatory scheme." (Pl.'s Obj. Mot. Summ. J. at 5.) Thus, the plaintiffs contend that enforcing the Releases would violate public policy by: (1) "allow[ing] [SNH] to avoid its statutory duties"; and (2) prevent[ing] the plaintiffs from pursuing a "statutory cause of action." (Id. at 6.) The Court agrees with the plaintiffs.

In this State, "[p]arties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably." Appeal of Silverstein, 163 N.H. 192, 202 (2012) (citation omitted). Despite this widely recognized general rule, courts will not enforce a "contract or contract term that contravenes public policy." Harper v. Healthsource N.H., 140 N.H.

770, 775 (1996).  The same rule applies to liability waiver contracts, and the burden is

on SNH to show that the "exculpatory agreement does not contravene public policy."

McGrath v. SNH Dev., Inc., 158 N.H. 540, 543 (2009) (citation omitted).  A contractual

clause is

> against public policy if it is injurious to the interests of the public,
> contravenes some established interest of society, violates some public
> statute, is against good morals, tends to interfere with the public welfare or
> safety, or, as it is sometimes put, if it is at war with the interests of society
> and is in conflict with the morals of the time.

Harper, 140 N.H. at 775 (citations omitted).  To determine public policy, the Court looks

to "controlling statutes, regulations, common law, and other applicable authority."

Appeal of Town of Pelham, 154 N.H. 125, 130 (2006).  Public policy "review is limited to

the confines of positive law, rather than general considerations of supposed public

interests."  Id. at 129 (citation omitted).

RSA 225-A "is a comprehensive statute governing skiers and the operation of ski

areas."  Soraghan v. Mt. Cranmore Ski Resort, Inc., 152 N.H. 399, 406 (2005).

Relevant here, RSA 225-A:1 establishes the State's public policy with regard to ski lifts:

> [I]t shall be the policy of the state of New Hampshire . . . to ensure that
> proper design and construction are used, that board accepted safety
> devices and sufficient personnel are provided for, and that periodic
> inspections and adjustments are made which are deemed essential to the
> safe operation of ski tows, ski lifts, nordic ski jumps and passenger
> tramways.  The primary responsibility for operation, construction,
> maintenance and inspection rests with the operators of such passenger
> tramway devices.

(Emphases added).  This "declaration of policy sets forth in some detail that the State of

New Hampshire intends to protect its citizens and visitors from unnecessary [ ] hazards

from the operation of ski tows, lifts and tramways and that [ ] the primary responsibility

for [operation], construction and maintenance shall rest with the operator."  Adie v.

<u>Temple Mountain Ski Area</u>, 108 N.H. 480, 482 (1968).  The statute is a clear indication of a "strong and dominant public policy."  <u>Appeal of Town of Pelham</u>, 154 N.H. at 130. To effectuate that public policy, the legislature enacted RSA 225-A:25, I, to give a statutory cause of action to those injured as a result of an operator's violations of the applicable ski lift safety rules.

In this case, the effect of the Release is to bar that statutory cause of action <u>before</u> any injury occurs.  Under New Hampshire case law, "[s]uch an agreement is unenforceable because a party cannot in advance, make a valid promise that a statute founded in public policy shall be inoperative."  <u>W. Gate Vill. Ass'n v. Dubois</u>, 145 N.H. 293, 299 (2000) (quotation omitted).  This is a widely recognized rule of law that even the United States Supreme Court has acknowledged in many cases.  <u>See, e.g.</u>, <u>Am. Exp. Co. v. Italian Colors Rest.</u>, 133 S. Ct. 2304, 2313–14 (2013) (<u>Kagan</u>, J., dissenting) (explaining that "courts will not enforce a prospective waiver of" the Sherman Act's private cause of action, and noting that "[t]he same rule applies to other important federal statutory rights") (collecting cases).[2]  The reasoning for such a rule is sound: enforcing the Release could allow ski lift operators to skirt the safety rules established by the board pursuant to RSA 225-A.[3]  Indeed, the New Hampshire Supreme Court has

---

[2] SNH's reliance on <u>Brigance v. Vail Summit Resorts, Inc.</u>, is unavailing because, in that case, the plaintiff did "not have any pending claims for breach of the Skier Safety Act, or of the Passenger Tramway Safety Act." No. 15-CV-1394-WJM-NYW, 2017 WL 131797, at *9 (D. Colo. Jan. 13, 2017).  In fact, at least one Colorado state court has held that claims based on violations of the passenger tramway safety board regulations cannot be waived by pre-injury release.  <u>See</u> <u>Bradley v. Aspen Skiing Co.</u>, LLC, No. 11-CV-43, slip. op. at 3 (Colo. Dist. Ct. May 10, 2012).

[3] <u>See</u> <u>Cange v. Stotler & Co.</u>, 826 F.2d 581, 595 n. 11 (7th Cir. 1987) (recognizing that "prospective waivers of statutory rights tend to encourage violations of the law by notifying the wrongdoer in advance that he or she can act with impunity"); <u>Laliberte v. White Water Mountain Resorts</u>, No. X07CV030083300S, 2004 WL 1965868, at *4 (Conn. Super. Ct. Aug. 2, 2004) ("If liability for breach of statutory duty may be waived preinjury, the operator of a recreational facility could design, construct, and run a facility in total disregard of the legislatively prescribed rules with impunity, as to civil damages, simply by restricting use of the facility to those patrons willing to sign a release.")

refused to enforce contractual provisions on public policy grounds where doing so would endanger the public's safe use of other forms of transportation.  See Appeal of Amalgamated Transit Union, Local 717, 144 N.H. 325, 329 (1999) (CBA clause violated public policy where it permitted arbitrator to reinstate two transit employees who tested positive for drug use).

In sum, the private cause of action established by RSA 225-A:25 is founded on the public policy of this State to provide safe ski lift operations to passengers.  As such, a party cannot prospectively waive that statutory cause of action.  W. Gate Vill. Ass'n, 145 N.H. at 299; see also McCarthy v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 226 A.2d 713, 715 (N.J. 1967) ("The prescribed safety requirements may not be contracted away, for if they could be the salient protective purposes of the legislation would largely be nullified."); Laliberte, 2004 WL 1965868, at *4 (enforcing liability release for violations of ski safety rules could allow "operator [to] repeal the protection of the legislatively selected class member by member").  Therefore, to the extent the Releases could be read to encompass the plaintiffs' statutory claims, they are unenforceable as to those claims.  SNH's motion for summary judgment as to Count VI is accordingly DENIED.

II.  Common Law Negligence Claims

Next, SNH argues that the Releases bar the plaintiffs' common law claims for negligence, negligent supervision, gross negligence, and negligent infliction of emotional distress.  "In New Hampshire, exculpatory contracts are generally prohibited." Barnes v. N.H. Karting Ass'n, 128 N.H. 102, 106 (1986).  Nonetheless, the Court will enforce prospective waivers of negligence claims so long as: "(1) they do not violate public policy; (2) the plaintiff understood the import of the agreement or a reasonable

person in his position would have understood the import of the agreement; and (3) the plaintiff's claims were within the contemplation of the parties when they executed the contract." <u>McGrath</u>, 158 N.H. at 542 (citation omitted). Here, the plaintiffs assert that the Release is unenforceable against Sarah because a parent cannot waive the prospective legal claims of his or her minor child. In addition, the plaintiffs seem[4] to argue that the Release fails all three prongs of the <u>McGrath</u> test independent of that issue. The Court will address each of these arguments in turn.

### A. Enforceability of the Release as to Sarah

First, the plaintiffs contend that public policy bars a parent from waiving a minor's prospective legal claims, and therefore the Release is unenforceable as to any of Sarah's claims. In response, the defendants maintain that parents have a constitutional right to raise and make decisions on behalf of their children, and as such, they may waive prospective claims on behalf of their children. The plaintiffs appear to raise their public policy argument under the *parens patriae* doctrine. *Parens patriae* refers to "the state in its capacity as provider of protection to those unable to care for themselves." <u>Black's Law Dictionary</u> 1221 (9th ed. 2009). Under this doctrine, "the parental interest in raising children without State intervention is not without limitation." <u>Preston v. Mercieri</u>, 133 N.H. 36, 40 (1990). Parental rights are in fact "subordinate to the State's *parens patriae* power, and must yield to the welfare of the child." <u>In re Berg</u>, 152 N.H. 658, 661 (2005) (quotation omitted). Relevant here, "infants are peculiarly under the care and protection of the Court because of their incapacities." <u>Hollis v. Tilton</u>, 90 N.H. 119, 120 (1939) (quotation omitted). As such, "the superior court, as an instrumentality

---

[4] The supreme court somewhat blurred the distinction between the second and third prong in <u>Wright v. Loon Mountain Recreation Corp.</u>, 140 N.H. 166 (1995), and the plaintiffs appear to follow that case in making their argument. However, in the interest of thoroughness, the Court will address all three prongs.

of the State," may invoke its "*parens patriae* power" to protect the best interests of children.  Roberts v. Ward, 126 N.H. 388, 392 (1985).

Here, however, the Court need not engage in a public policy analysis regarding this issue[5] because New Hampshire law is clear that Jean lacked the authority to waive Sarah's prospective negligence claims.  "Generally speaking, a parent cannot waive the substantive rights of a minor child."  State ex rel. Fabian v. Fabian, 116 N.H. 516, 518 (1976) (citations omitted) (parent could not waive minor's right to future child support payments); see also Kinney v. Kinney, 122 N.H. 1165, 1167 (1982) (parent cannot waive "a duty owed [to] a minor child" by agreement).[6]  Under New Hampshire law, "there are only two recognized ways in which a minor may take binding action in the

---

[5] The Court notes that the "substantial majority" of courts that have considered this issue hold that such releases violate public policy.  Rosen v. BJ's Wholesale Club, Inc., 51 A.3d 100, 107 (Md. Ct. Spec. App. 2012), rev'd, 80 A.3d 345 (2013) (collecting cases).  If the Court were pressed to decide this issue on public policy grounds, it would be inclined to join that majority.  Although SNH has cited several cases holding otherwise, they are distinguishable.  For instance, the Massachusetts Supreme Judicial Court upheld a father's release on public policy grounds, but noted that "Massachusetts law favors the enforcement of releases."  Sharon v. City of Newton, 769 N.E.2d 738, 744 (Mass. 2002).  As noted above, this is not the case in New Hampshire.  The Massachusetts Supreme Judicial Court also seemed to place particular emphasis on the fact that the injury took place in the context of a public school athletic program.  Likewise, in Zivich v. Mentor Soccer Club, Inc., the Ohio Supreme Court emphasized that the activity at issue involved volunteers and limited its holding to that effect: "We hold that parents have the authority to bind their minor children to exculpatory agreements in favor of volunteers and sponsors of nonprofit sport activities where the cause of action sounds in negligence."  696 N.E.2d 201, 207 (Ohio 1998) (emphasis added).  However, the instant case involves a commercial entity, rather than a public school or a non-profit organization.  In BJ's Wholesale Club, Inc. v. Rosen, 80 A.3d 345 (Md. 2013), the Maryland Court of Appeals upheld a parental release, but focused on the fact that parents could settle their minor's tort claims without judicial approval in that state.  However, as will be discussed below, that is not the case in New Hampshire.  In Kondrad ex rel. McPhail v. Bismarck Park Dist., 655 N.W.2d 411 (N.D. 2003) the North Dakota Supreme Court found that the minor's alleged injuries were within the scope of a release executed by a parent.  However, the enforceability of the release on public policy grounds was not an issue before the court.  In Osborn v. Cascade Mountain, Inc., 655 N.W.2d 546 (Wis. Ct. App. 2002) (table), an unpublished and non-precedential order, the Wisconsin Court of Appeals summarily upheld a negligence waiver signed by a parent but with no discussion regarding public policy.

[6] See also Int'l Union, UAW v. Johnson Controls, Inc., 499 U.S. 187, 213 (1991) (White, J., concurring) (explaining that "the general rule is that parents cannot waive causes of action on behalf of their children"); Stockman v. City of S. Portland, 87 A.2d 679, 683 (Me. 1952) ("It is the prevailing view that a guardian may not waive legal rights in behalf of his ward, or surrender or impair rights vested in the ward, or impose any legal burden thereon.") (quotation omitted); Meyer v. Naperville Manner, Inc., 634 N.E.2d 411, 414 (Ill. App. Ct. 1994) ("It is now the general rule that, in the absence of statutory or judicial authorization, a parent cannot waive, compromise, or release a minor child's cause of action merely because of the parental relationship.").

enforcement or discharge of his legal rights, namely, through a duly appointed guardian acting within his powers, or through his next friend by proceedings in court." Roberts v. Hillsborough Mills, 85 N.H. 517, 519 (1932) (citations omitted) (mother lacked authority to waive her minor son's right to recover for workplace injuries). If neither one of those procedures are employed, then a parent has "no authority to bind the [minor]," and the minor has a "legal right to repudiate the" parent's action. Id.; see also Merchs. Mut. Cas. Co. v. Kiley, 92 N.H. 323, 325 (1943) (noting that, "in the absence of court proceedings, the release executed by [father] as father and next friend of his daughter, would not bar her rights"); White v. Boulia-Gorrell Lumber Co., 85 N.H. 543, 543 (1932) (release ineffective when signed by minor's father as "next friend").

In the Court's view, Roberts conclusively establishes that Jean lacked the authority to waive Sarah's prospective legal rights. Jean was not appointed as a guardian ad litem by any court, nor were there ongoing legal proceedings at the time the Release was signed. Likewise, SNH has pointed to no statutory provision authorizing Jean to sign the Release in question. As such, under Roberts, Sarah could repudiate the Release, and did so when she brought this "action at law through [her] next friend." Roberts, 85 N.H. at 519. Accordingly, the Court finds that the Release does not bar any of Sarah's claims. See Woodman ex rel. Woodman v. Kera LLC, 785 N.W.2d 1, 9 (Mich. 2010) ("The application of the common law in this case is simple and straightforward. The waiver at issue is a contractual release. [The father] signed the waiver on behalf of his son, thereby intending to bind [his son] to that contract. Under the common law, [the father] was without authority to do so. Accordingly, the waiver is not enforceable against [the son] and does not bar his cause of action.").

## B. Indemnification

SNH has a fallback argument.  It asserts that the indemnification clause of the Release is binding on Jean, and therefore Jean must indemnify it for any of Sarah's injuries.  As noted above, the indemnification clause provides as follows:

> **I agree,** for myself and/or my child, to **RELEASE, indemnify, defend, and hold harmless the Ski Areas** from liability for any and all loss or damage to myself or to my child or my or my child's property resulting **from the Ski Areas' NEGLIGENCE** . . . .

(Emphases in original.)  The Court "interpret[s] an indemnity [agreement] in the same manner as [it] do[es] contracts generally." Gulf Ins. Co. v. AMSCO, Inc., 153 N.H. 28, 34 (2005) (citation omitted).  One exception, however, is that "indemnity agreements are strictly construed, particularly when they purport to shift responsibility for an individual's own negligence to another." Merrimack Sch. Dist. v. Nat'l Sch. Bus Serv., 140 N.H. 9, 12 (1995).  Moreover, as with other contracts and contractual provisions, the Court will not enforce an indemnity provision that offends public policy. See, e.g., Commercial Union Assurance Co. v. Brown Co., 120 N.H. 620, 625 (1980) (determining that indemnity provision in construction contract was not void as being against public policy). Here, the plaintiffs assert that the indemnification agreement violates public policy and is therefore unenforceable.  The Court agrees.

As a general rule, "[c]ontracts which provide for indemnification of a party against his own future acts of negligence are generally not prohibited." Id. (citing 41 Am. Jur. 2d Indemnity § 9 (1968)).  "However, an agreement to indemnify and hold harmless a party against all loss and expense by reason of any suit subsequently brought by or on behalf of the infant child of the indemnitor is unenforceable as a matter of public policy." 41 Am. Jur. 2d Indemnity § 11 (2017).  As noted by the New York Court of Appeals, "a

parent who has placed himself in the position of indemnitor will be a dubious champion of his infant child's rights." Valdimer v. Mount Vernon Hebrew Camps, Inc., 172 N.E.2d 283, 285 (N.Y. 1961). The Valdimer court went on to explain:

> [W]e are extremely wary of a transaction that puts parent and child at cross-purposes and, in the main, normally tends to quiet the legitimate complaint of the minor child. Generally, we may regard the parent's contract of indemnity, however[ ] well-intended, as an instrument that motivates him to discourage the proper prosecution of the infant's claim, if that contract be legal. The end result is either the outright thwarting of our protective policy [of children] or, should the infant ultimately elect to ignore the settlement and to press his claim, disharmony within the family unit. Whatever the outcome, the policy of the State suffers.

Id. (case cited with approval in Heath v. Seymour, 110 N.H. 425, 431 (1970)).

This reasoning is persuasive and in accord with New Hampshire law. For instance, pursuant to Superior Court Rule 40 and RSA 464-A:42, a parent may not settle a lawsuit brought on behalf of a minor without judicial approval, unless the net amount of the settlement is less than $10,000. "The purpose of [Rule 40] and [RSA 464-A:42] is to provide a method by which the settlement of a minor's claim will be fair when made and the proceeds will be preserved and properly applied for the benefit of the minor thereafter." Cnaeps v. Brown, 101 N.H. 116, 117 (1957). Rule 40 and RSA 464-A:42 therefore "allow the court to protect the interests of the infant so far as possible." Id. at 118. This statutory provision and others "indicate a legislative policy to protect infants and minors in a variety of ways." Gaudreau v. Gaudreau, 106 N.H. 551, 553 (1965). Likewise, the supreme court has emphasized the importance of family harmony and has carefully scrutinized whether to permit actions where the "family well-being will be appreciably harmed." Briere v. Briere, 107 N.H. 432, 435 (1966); Bonte v. Bonte, 136 N.H. 286, 289 (1992) (recognizing that "preservation of parental authority

and family harmony" was a "valid" concern).  Therefore, the Court concludes that, under New Hampshire law and the reasoning adopted by numerous other jurisdictions,[7] the indemnification clause violates public policy and is unenforceable.

### C. *McGrath Test as to Jean's Release*

As discussed above, "[a] defendant seeking to avoid liability must [first] show that an exculpatory agreement does not contravene public policy."  McGrath, 158 N.H. at 543 (citation omitted).  An exculpatory agreement may offend public policy where: (1) a "special relationship existed between the parties"; (2) "there [is a] disparity in bargaining power"; or (3) "it is injurious to the interests of the public, violates some public statute, or tends to interfere with the public welfare or safety."  Id. (citation omitted).  The plaintiffs argue that the third category applies here because of the existence of RSA 225-A and the public policy it evinces.  The Court disagrees.

---

[7] As far as the Court can discern, every other jurisdiction to address this issue has held such indemnifications unenforceable on similar grounds.  See Cooper v. Aspen Skiing Co., 48 P.3d 1229, 1237 (Colo. 2002) ("Thus, we agree with the reasoning of those courts invalidating parental indemnity provisions that a minor child would be unlikely to pursue claims if his parent or guardian served as the ultimate source of compensation for the negligent party's torts, and that—if the child did bring a cause of action—family discord would likely result."); Hawkins v. Peart, 37 P.3d 1062, 1067 (Utah 2001) (reasoning that "an indemnification from negligence that specifically makes a parent the ultimate source of compensation would likely result in inadequate compensation for the minor or family discord" and holding that parental indemnification provisions are invalid); Ohio Cas. Ins. Co. v. Mallison, 354 P.2d 800, 802–03 (Or. 1960) ("A child, realizing that his recovery from the defendant would ultimately call for the parent to indemnify the defendant, would not be likely to pursue his rights.  The policy which discourages the bringing of actions by a child against the parent on the ground that family harmony may be jeopardized would apply as well where the parents' liability arises indirectly through the enforcement of an indemnity agreement . . . We believe, therefore, that the agreement relied upon the plaintiff in the instant case violates public policy in the particulars just described."); Claire's Boutiques v. Locastro, 85 So. 3d 1192, 1199 (Fla. Dist. Ct. App. 2012) ("Allowing a parent to agree to indemnify a third party for any damages suffered by her child seriously undermines the parent-child relationship and places undue financial burden on the family unit in the same way a pre-injury release compromises those same interests.  Thus, such an indemnification agreement is void and unenforceable."); Childress By & Through Childress v. Madison Cnty., 777 S.W.2d 1, 7 (Tenn. Ct. App. 1989) ("Indemnification agreements executed by a parent or guardian in favor of tort feasors, actual or potential, committing torts against an infant or incompetent, are invalid as they place the interests of the child or incompetent against those of the parent or guardian.").  The Court is not aware of, nor has SNH offered, any authority to the contrary.  Even those jurisdictions that have upheld parental negligence releases have not addressed the enforceability of indemnification clauses.  See, e.g., BJ's Wholesale Club, Inc. v. Rosen, 80 A.3d 345, 350 (Md. 2013) (holding that parental waiver of negligence was not against public policy, but explicitly declining to address enforceability of indemnification provision).

While the Court does not find that the Release bars Jean's *statutory* cause of action, it does not follow that it cannot bar her common law negligence claims.  In McGrath, the plaintiff was skiing at Crotched Mountain and was injured when she collided with a snowmobile operated by one of Crotched Mountain's employees.  Id. at 541.  Like Jean, Ms. McGrath signed a liability release agreement in order to obtain a season pass, which released Crotched Mountain "from any and all liability for personal injury which results in any way from negligence."  Id. at 542 (ellipsis omitted).  On appeal, Ms. McGrath argued that "public policy is clearly offended by the notion that the Defendants would be relieved from public safety laws enacted pertaining to snowmobiles," and pointed to several statutes regulating the safe operation of snowmobiles.  Id. at 543 (brackets omitted).  The supreme court rejected this argument, holding that "[t]he fact that an exculpatory agreement waives the right to bring a negligence action arising out of an activity that is regulated by statute is not determinative of a public policy violation."  Id.  Central to court's reasoning was the fact that the State was "charged with enforcing th[e] statute[s]" and therefore "the interests of the public [were] protected by the State's ability to enforce the statute."  Id.

Likewise, in this case, the interests of ski lift passengers are protected by the passengers' right to bring a private cause of action under RSA 225-A:25 for violations of the ski safety statute or of the rules of the board as discussed above.  Accordingly, like the McGrath court, the Court does not find that the waiver of common law negligence claims violates public policy as established by RSA 225-A:25, as passengers still have the ability to maintain a statutory cause of action.  See also Lee v. Sun Valley Co., 695 P.2d 361, 364 (Idaho 1984) (holding that liability waiver "between Sun Valley and

plaintiff <u>does absolve Sun Valley from common law liabilities</u>, [but] it does not absolve

Sun Valley from liability for possible violation of the public duty imposed by [statute]")

(emphasis added).

"Once an exculpatory agreement is found unobjectionable as a matter of public

policy, it will be upheld only if it appears that the plaintiff understood the import of the

agreement or that a reasonable person in his position would have known of the

exculpatory provision." <u>Barnes</u>, 128 N.H. at 107.  In making this determination, the

Court examines "the language of the release." <u>Wright</u>, 140 N.H. at 169 (citation

omitted).  "A reasonable person would understand the provision if its language clearly

and specifically indicates the intent to release the defendant from liability for personal

injury caused by the defendant's negligence . . . ." <u>Id</u>. (citation omitted).  The Court

"assess[es] the clarity of the contract by evaluating it as a whole, not by examining

isolated words and phrases." <u>Id</u>. at 169–70 (citation omitted).  If the exculpatory

language is unclear, then a factual issue exists as to whether the plaintiff understood its

import. <u>Id</u>. at 169.

In this case, the plaintiffs do not argue "that [Jean] was denied the opportunity to

read the body of the release." <u>Barnes</u>, 128 N.H. at 108.  Similarly, there is nothing in

the record to suggest that the release was physically unreadable. <u>Cf</u>. <u>Jenks v. N.H.</u>

<u>Motor Speedway, Inc.</u>, No. 09-cv-205-JD, 2010 U.S. Dist. LEXIS 19668, at *13–14

(D.N.H. Mar. 3, 2010) (material factual dispute existed as to whether plaintiff knew of

release where she put her name on volunteer sign-up sheet and "there was no

indication that the form was a release" and "some of the release language [was]

obscured by the large, bold handwriting").  Moreover, this is not a case where the

exculpatory clause is buried in a long-form contract. See Wright, 140 N.H. at 170 (looking to "contract structure and organization" to determine if exculpatory clauses were obscured); see also Johnson v. UBAR, LLC, 210 P.3d 1021, 1023 (Wash. Ct. App. 2009) (court should consider "whether the waiver is set apart or hidden within other provisions, whether the heading is clear, [and] whether the waiver is set off in capital letters or in bold type"). Rather, the Release is located on its own page. The title of the document is "**SEASON PASSHOLDER ACCEPTANCE OF RISKS AND LIABILITY RELEASE AGREEMENT**" in bolded capital letters. There are only five substantive paragraphs, each of which is easy to read. See Cailler v. Humble Oil & Ref. Co., 117 N.H. 915, 919 (1977) (exculpatory clauses enforceable where they were "written in plain language and not in smaller print than the rest of the thirteen clauses").

The exculpatory provisions, contained in the third and fourth paragraphs, plainly indicate to a reasonable person that he or she would be assuming the risk of any injury occurring at SNH and waiving any negligence claims against SNH. For instance, the first sentence in the third paragraph reads, "**I agree** . . . to **RELEASE, indemnify, and hold harmless the Ski Areas** from liability for any and all loss or damage to myself or to my child or my or my child's property resulting from the Ski Areas' **NEGLIGENCE** . . . ." (Emphases in original). The two sentences following that one are equally clear on the issue of negligence release: "I understand that the Ski Areas are not responsible for the consequences of their own **NEGLIGENCE**, that is, their failure to use reasonable care in any way. I acknowledge that I am freely and expressly assuming and accepting any and all risks of property damage, personal injury and death in connection with my or my child's use of the Ski Areas premises . . . ." (Emphasis in original); cf. Audley v.

Melton, 138 N.H. 416, 419 (1994) (release invalid where it did not use word "negligence"). Additionally, above the signature line, the Release states: "**This Release of Liability Agreement must be agreed to and signed to process order.** I acknowledge that I have read and understand the terms of this document and that I am signing it freely and voluntarily." (Emphasis in original); see Serna v. Lafayette Nordic Vill., Inc., No. 14-CV-049-JD, 2015 U.S. Dist. LEXIS 92669, at *7 (D.N.H. July 16, 2015) (release enforceable where it stated "I have read the agreement on the back of the form, releasing the [defendant] from liability. I voluntarily agree to the terms of that agreement."). These two sentences, printed partially in bolded font, provide the reader one final notice about the nature of the document before signing it.

In sum, after considering the title and structure of the Release, its language, and the multiple times the reader is advised of the negligence liability waiver, the Court concludes that it "clearly and specifically indicates the intent to release the defendant from liability for personal injury caused by the defendant's negligence." Barnes, 128 N.H. at 107. As such, any reasonable person "would have known of the exculpatory provision," id., thereby satisfying the second prong of the analysis.

Finally, "[i]n order to uphold an exculpatory contract, the plaintiff's claims must have been within the contemplation of the parties at the time of the execution of the agreement." McGrath, 158 N.H. at 545 (citation omitted). "To determine the scope of the application and liability release agreement, [the Court] examine[s] its language." Id. (citation omitted). The Court "give[s] the language used by the parties its common meaning and give the contract itself the meaning that would be attached to it by a reasonable person." Id. (citation omitted). "As long as the language of the release

clearly and specifically indicates the intent to release the defendant from liability for personal injury caused by the defendant's negligence, the agreement will be upheld." Id. (citation omitted). The Court "strictly construe[s] exculpatory contracts against the defendant." Id. (citation omitted).

Here, the plaintiffs argue that the "the language of the release would not put a reasonable person on notice that it disclaimed liability for improper operation of a ski lift." (Pls.' Obj. Def.'s Mot. Summ. J. at 17.) As outlined above, Paragraph Four of the Release states:

> **I agree,** for myself and/or my child, to **RELEASE, indemnify, defend, and hold harmless [Crotched Mountain] from liability for any and all loss or damage to myself or to my child or my or my child's property resulting from [Crotched Mountain's] NEGLIGENCE, <u>including but not limited to the risks described above</u>, in the operation, maintenance or design of [Crotched Mountain] and from my participation in any activities at [Crotched Mountain], even if those activities are unrelated to alpine activities.**

(Underline added; bold and capitalization in original). The plaintiffs assert that the "risks described above" do not include "ski lift use or operation" and therefore the waiver should be effective only against those risks actually delineated above. (Pls.' Obj. Def.'s Mot. Summ. J. at 18.) The Court disagrees. First, the Release specifically states that it applies to "any and all" liability relating to Crotched Mountain's negligence, and also states that the above-described risks are not exclusive. See McGrath, 158 N.H. at 545 ("While the application and liability release agreement do not specifically make reference to injuries arising from the negligent operation of a snowmobile, the language of these agreements clearly and specifically indicates the intent to release the defendants from liability for personal injury caused by the defendants' negligence, which is all that is required."). More importantly, however, the first sentence of the Release

states: "ACCEPTANCE OF RISKS:  All forms of alpine activities such as skiing and snowboarding, <u>including the use of lifts</u>, are hazardous."  (Emphasis added.)  Thus, the plaintiffs' contention that the Release fails to list ski lift use as a delineated risk is factually incorrect.  In sum, reading the first sentence of the Release in conjunction with Paragraph Four, a reasonable person would understand the Release as applying to any negligence claims related to the operation of the chair lift.  As such, the Release bars Jean's common law negligence claims.

### D.  Conclusion

The Court finds that under New Hampshire law, a parent may not prospectively waive legal claims on behalf of his or her minor child.  Accordingly, the Release is unenforceable as to Sarah's common law claims.  Likewise, the indemnification clause is unenforceable as it violates public policy.  However, the Court finds that Release, as it applies to Jean, satisfies all three prongs of the <u>McGrath</u> test.  As such, Jean's common law claims for negligence, negligent supervision, gross negligence,[8] and negligent infliction of emotional distress are barred by the Release.

### III.  Recklessness Claims

Count V of the plaintiffs' complaint is labeled "Recklessness."  In that Count, they allege that

> Crotched Mountain's employee(s)['] total and complete failure to monitor the safe and proper loading of the Rocket chair lift in any fashion, coupled with the undisputed failure (actions or inactions) to stop the chair lift once a life threatening emergency was clearly in progress and ongoing for a considerable period of time, were failures to do acts which the employees had a duty to perform for Sarah and Jean and constitute a reckless disregard of safety.

---

[8] In <u>Barnes</u>, the supreme court held that a liability release for negligence also covered claims for "gross negligence" because "New Hampshire law does not distinguish causes of action based on ordinary and gross negligence."  128 N.H. at 108.

(Compl. ¶ 135.)  The plaintiffs further alleged that "Crotched Mountain's employee(s)' actions or inactions constituted an indifference to an aggravated degree of risk about which the Crotched Mountain's employee(s) should have known" and that their actions/inactions "were substantially more serious than ordinary negligence to the point [that] they constitute recklessness."  (Id. ¶¶ 139–40.)

SNH first asserts that this claim is barred because recklessness is essentially a form of aggravated negligence, and the Release bars negligence claims.  The Court disagrees.  In this case, the Release specifically defines "negligence" as the "failure to use reasonable care," whereas a claim of reckless conduct "involves conduct evincing disregard of or indifference to consequences under circumstances involving danger to life or safety of others, although no harm was intended." Migdal v. Stamp, 132 N.H. 171, 176 (1989) (quotation omitted).  Moreover, exculpatory agreements are not generally "construed to cover the more extreme forms of negligence, described as willful, wanton, reckless or gross, or to any conduct which constitutes an intentional tort." Carleton v. Winter, 901 A.2d 174, 181 (D.C. 2006) (brackets omitted; quoting W. Page Keeton, et al., Prosser and Keeton on Torts, § 68 at 483–84 (5th ed. 1984)). Therefore, the Court disagrees with SNH's assertion that reckless conduct is included in the term "negligence" in the Release.[9]

SNH alternatively argues that, "[e]ven if [ ] recklessness [is not treated] as a type of negligence," the recklessness claim is barred by the following language in the

---

[9] While the supreme court has noted in passing that "reckless conduct" is "generally [ ] treated . . . as an aggravated type of negligence," Akerley v. Hartford Ins. Grp., 136 N.H. 433, 437 (1992) (citation omitted), the court has also recognized that "reckless conduct" is not the same as "negligence." See Migdal, 132 N.H. at 176 (holding that the "Fireman's Rule" barred claims for ordinary negligence, but not for "claim[s] of reckless or wanton conduct"); Hickingbotham v. Burke, 140 N.H. 28, 33, (1995) (social host liability for reckless conduct but not ordinary negligence); see also Hanks v. Powder Ridge Rest. Corp., 885 A.2d 734, 748 (Conn. 2005) (because Connecticut common law did not distinguish between degrees of negligence, a party would have to allege recklessness to overcome any negligence waiver).

Release: "I acknowledge that I am freely and expressly assuming and accepting <u>any and all risks</u> of property damage, <u>personal injury and death in connection with my or my child's use of the Ski Areas premises</u>."  (Def.'s Reply Memo. Supp. Mot. Summ. J. at 20. (emphases added).)  In response, the plaintiffs argue that "an attempted release of recklessness is against public policy."  (Pls.' Obj. Mot. Summ. J. at 22.)  The Court agrees with the plaintiffs.  It is widely held that "exculpatory clauses in contracts are invalid and will not be enforced[ ] when a party to the contract attempts to avoid liability for intentional conduct or harm caused by reckless [ ] behavior."  <u>Adloo v. H.T. Brown Real Estate, Inc.</u>, 686 A.2d 298, 301 (Md. 1996).  This is because "there is a dominant public policy against allowing exculpatory releases of reckless behavior, which encourages parties to adhere to minimal standards of care and safety."  <u>Tayar v. Camelback Ski Corp.</u>, 47 A.3d 1190, 1203 (Pa. 2012).[10]

Although this remains an issue of first impression in this State, the Court believes that the New Hampshire Supreme Court would adopt a similar rule if given the chance for similar reasons.  In addition, as noted above, the supreme court has traditionally been more hesitant to bar recovery for injuries sustained as a result of reckless behavior.  <u>See Migdal</u>, 132 N.H. at 176 (holding that the "Fireman's Rule" barred claims for ordinary negligence, but not for "claim[s] of reckless or wanton conduct"); <u>Hickingbotham</u>, 140 N.H. at 33 (social host liability for reckless conduct but not ordinary negligence); <u>Stewart v. Bader</u>, 154 N.H. 75, 87 (2006) (allowing enhanced compensatory damages for "wanton" acts); <u>Thompson v. Forest</u>, 136 N.H. 215, 220

---

[10] The Pennsylvania Supreme Court noted that "28 of our sister states have addressed whether enforcing releases for reckless behavior is against public policy," and only two had enforced such releases.  <u>Tayar</u>, 47 A.3d at 1203.  The <u>Tayar</u> Court went on to join that majority; thus, it appears that at least 27 states refuse to enforce reckless conduct waivers on public policy grounds.

(1992) (noting that "[w]illful, wanton and reckless conduct" could constitute an intentional tort under certain circumstances and therefore avoid worker's compensation immunity provision for co-workers). Moreover, there is a general animus towards exculpatory contracts in this State for even ordinary negligence, see Barnes, 128 N.H. at 106 (explaining that "exculpatory contracts are generally prohibited"); thus, it follows that the supreme court would be even more reluctant to enforce an exculpatory clause relating to reckless conduct. For these reasons, the Court holds that the Release is unenforceable as to any claim based on reckless conduct.

Finally, SNH asserts in its reply memorandum that the allegations in the complaint fail to allege reckless conduct. This is akin to a motion to dismiss for failure to state a claim and the Court will treat it as such. In ruling on a motion to dismiss, the Court considers "whether the allegations in the plaintiff[s'] pleadings are reasonably susceptible of a construction that would permit recovery." Cluff-Landry v. Roman Catholic Bishop of Manchester, 169 N.H. 670, 673 (2017) (citation omitted). The Court must "assume the well-pleaded allegations of fact in the [complaint] to be true, and construe all reasonable inferences from them in the plaintiff[s'] favor," but "need not [ ] assume the truth of statements in the pleadings that are merely conclusions of law." Ojo v. Lorenzo, 164 N.H. 717, 721 (2013) (citation omitted). "If the facts do not constitute a basis for legal relief," the Court should grant the motion to dismiss." Lamb v. Shaker Reg'l Sch. Dist., 168 N.H. 47, 49 (2015) (citation omitted).

It is well-established that recklessness "is a *mens rea* that is greater than negligence but less than intentional." Farrelly v. City of Concord, 902 F. Supp. 2d 178, 204 (D.N.H. 2012) (quotation omitted). The New Hampshire Supreme Court, however,

has not provided a single definition of reckless behavior in the tort context. As noted above, in Migdal, the supreme court, citing the 1979 version of Black's Law Dictionary, stated that "'recklessness' involves conduct evincing disregard of or indifference to consequences under circumstances involving danger to life or safety of others, although no harm was intended." 132 N.H. at 176 (quotation omitted). In Hickingbotham, the court, citing to the 1990 version of Black's Law Dictionary, stated that behavior "would be reckless if the [actor] consciously disregarded a substantial and unjustifiable risk of a high degree of danger." 140 N.H. at 33 (quotation omitted; emphasis added). The latter definition is used in the criminal context. See RSA 626:2, II(c); State v. Belleville, 166 N.H. 58, 63 (2014). The difference between the definitions was noted in Kukesh v. Mutrie, but the supreme court stated that it "was not convinced that there [was] a material difference between the[m]." 168 N.H. 76, 83 (2015).

SNH argues that the plaintiffs fail to state a claim for recklessness because they "have not pled any type of conscious or intentional choice by Crotched Mountain," a requirement under the second definition. (Def.'s Reply Mem. Supp. Mot. Summ. J. at 20.) Even assuming that "conscious choice" is a requirement under the "recklessness" inquiry in the tort context, the Court disagrees that the plaintiffs have failed to plead sufficient facts to support their claim. The "conscious choice" requirement "is a subjective inquiry." State v. Hull, 149 N.H. 706, 713 (2003) (citation omitted). "[I]t may be proven by any surrounding facts and circumstances from which such awareness may be inferred." Id. Moreover, the plaintiffs need not use any specific words to make out a claim of reckless conduct; rather, the sufficiency of the plaintiffs' legal claim is determined by the factual allegations in the complaint. See Migdal, 132 N.H. at 176

(factual allegations were "sufficient to establish a claim of reckless or wanton conduct, even though the plaintiffs use[d] the term 'negligence' in their complaint").

After reviewing the factual allegations from the complaint in their entirety, and construing all reasonable inferences from them in the plaintiffs' favor, a jury could find that SNH's conduct was reckless. Specifically, the plaintiffs allege that there "were multiple employees of Crotched Mountain in or around the area observing that Sarah was not able to properly and/or safely board the Rocket chair lift; but rather [was] dangling from the chair lift." (Compl. ¶ 103). Based on this allegation, a reasonable inference can be made that SNH's employees knew that Sarah was not properly loaded on the chair lift, but chose not to act. See Hull, 149 N.H. at 713 (2003) (*mens rea* can be inferred from surrounding facts). The plaintiffs further allege that SNH's employees "knew" that their failure to "stop the chair lift once a life threatening emergency was clearly in progress" would create an "unreasonable risk of physical harm or death" to Sarah, (compl. ¶¶ 135–36), and that SNH's employees "did know, or should have known" about the "frequency of chair misloads with passengers," (compl. ¶ 138). Under New Hampshire's liberal pleading requirements, these allegations are sufficient to survive a motion to dismiss. See also Murdock v. City of Keene, 137 N.H. 70, 73 (1993) (claim of reckless behavior existed where plaintiff alleged that defendant had "actual knowledge" of known risk). Accordingly, SNH's motion for summary judgment as to Count V is DENIED.

## IV. Loss of Consortium Claims

SNH also moves for summary judgment on Mr. Perry's loss of consortium claims. SNH argues that "[w]here [it] has no liability for the underlying claims, it can have no

liability for claims which exist only as a result of those underlying claims." (Def.'s Mot. Summ. J. at 17.) In other words, SNH's argument was entirely premised on the Court entering summary judgment on all of Jean and Sarah's claims. However, as discussed above, many of their claims survive summary judgment.

SNH further asserts that "loss of consortium claims are not independent claims, but are rather derivative of and dependent upon the viability of the direct claims." (Id. (citation omitted).) The Court disagrees with this statement of the law. In New Hampshire, loss of consortium claims are not derivative claims, but are independent causes of action. See Brann v. Exeter Clinic, 127 N.H. 155, 160 (1985) ("This court removed all doubt that we view a loss of consortium claim as 'separate and distinct and not derivative' in Reid v. Spadone Mach. Co., 119 N.H. 198, 199 (1979)."). Therefore, even if some of Jean's claims are barred by the Release, it does not follow that Mr. Perry's loss of consortium claims are also barred. See Brann, 127 N.H. at 160 (rejecting argument that loss of "consortium is fundamentally a derivative claim and that a consortium verdict should be consistent with the verdict in the negligence action"). Accordingly, SNH's motion for summary judgment as to Mr. Perry's loss of consortium claims is DENIED.[11]

### Conclusion

Based on the foregoing, the Court summarizes its rulings on SNH's motion for summary judgment as follows:

1. The Releases are unenforceable as to the plaintiffs' statutory causes of action under RSA 225-A:25 as violative of public policy.

---

[11] See Dean v. Macdonald, 147 N.H. 263, 267 (2001) (affirming trial court's decision that husband's claim was barred by release, but remanding to trial court to address wife's loss of consortium claim).

2. Jean's common law claims for negligence, negligent supervision, gross negligence, and negligent infliction of emotional distress are barred by the Release she signed in her own name.  The Release that Jean signed on behalf of Sarah is unenforceable as to any of Sarah's claims and therefore SNH is not entitled to summary judgment on Sarah's common law claims. The indemnification agreement is unenforceable on public policy grounds to the extent it requires Jean to indemnify SNH for Sarah's damages.

3. The Releases are unenforceable as to any claims of reckless conduct on public policy grounds.  For the purposes of a motion to dismiss, the complaint sufficiently alleges facts from which reckless conduct could be found and/or inferred.

4. Based on the arguments presented, SNH is not entitled to summary judgment as to Mr. Perry's loss of consortium claims.

So ordered.

Date:  September 13, 2017

Hon. Charles S. Temple,
Presiding Justice