UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Lydia Lovering

    v.                                       Civil No. 24-cv-062-LM-AJ
                                             Opinion No. 2024 DNH 070 P

Brewster Academy

## **O R D E R**

In this diversity action, Lydia Lovering brings two claims sounding in negligence against her former high school, Brewster Academy. Brewster is a private boarding school in Wolfeboro, New Hampshire. Lydia alleges that Brewster acted negligently by leaving her behind on a Spanish island while evacuating students from a study-abroad program at the onset of the COVID-19 pandemic.[1] Brewster moves to dismiss both claims pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Lydia's claims are barred based on a document signed by Lydia and her mother, Jane, purporting to release and indemnify Brewster for all negligence claims stemming from the trip. Doc. nos. 5, 6. Lydia objects. Doc. no. 18. For the following reasons, the court denies Brewster's motion to dismiss.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the

---

[1] The court refers to Lydia Lovering and her mother, Jane Lovering, by their first names to avoid confusion.

plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 68, 71 (1st Cir. 2014) (quotation omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Analyzing plausibility is "a context-specific task" in which the court relies on its "judicial experience and common sense." Id. at 679. In ruling on a Rule 12(b)(6) motion, the court may consider documents if they are integral to or sufficiently referenced in the complaint or if the parties do not dispute their authenticity without converting the motion into one for summary judgment. Ironshore Specialty Ins. Co. v. United States, 871 F.3d 131, 135 (1st Cir. 2017).[2]

## BACKGROUND[3]

Lydia attended Brewster for her freshman and sophomore years of high school. Brewster offered a study-abroad program called the Brewster Global Program ("the Program"), which gave students the opportunity to travel and study internationally. One of the host locations is Tenerife, in the Spanish Canary

---

[2] Brewster argues for dismissal solely based on the language of the releases. Brewster does not argue that the complaint fails to allege sufficient facts to state claims of negligence.

[3] The facts are taken from the plaintiff's complaint (doc. no. 1), the documents attached thereto (docs. nos. 1-1, 1-2), and the "Off Campus Program – International Travel Parent and Student Authorization and Indemnification Agreement" ("the Agreement") referenced in plaintiff's complaint and attached to defendant's motion to dismiss (doc. no. 6-1). Neither party disputes the authenticity of the Agreement.

2

Islands. During her second year at Brewster, Lydia applied for and was accepted into the Program to study abroad in Tenerife.

Entry into the Program was contingent on Lydia and at least one parent signing the Agreement. The Agreement contains several provisions purporting both to limit Brewster's liability and to indemnify Brewster for claims related to the trip. In December 2019, Lydia (then fifteen years old) and her mother, Jane, signed the Agreement. The Loverings paid a fee in addition to Brewster's regular tuition price for Lydia's participation in the Program. Among other items, the fee covered twenty-four hour medical and travel security assistance and advice, and twenty-four hour "on-call support" from Brewster. Doc. no. 1 ¶ 14.

The trip to Tenerife was scheduled to last about two months, from January 6, 2020 to March 9, 2020. Prior to the start of the Program, Brewster informed the Loverings that three Brewster faculty members would run and supervise the Program: Sergio Vilariño Ferreiro ("Vilariño"), Mar González Iglesias, and Cristina Villaverde. Brewster also requested that the Loverings send Brewster a photocopy of Lydia's passport, which they did.

Lydia traveled to Tenerife as scheduled on January 6, 2020. At the time of the trip, Lydia was still fifteen years old and had never traveled abroad. While on Tenerife, Lydia stayed with a local host family, not with Brewster faculty. Other than the students' arrival and departure from Tenerife, the Program did not involve other international travel, so students had no need of their passports while on

3

Tenerife. Instead of securing the students' passports for them, Brewster instructed the students to safeguard their own passports.

Although the Tenerife trip was scheduled to end on March 9, 2020, there were multiple confirmed cases of COVID-19 on the Canary Islands by late February, including four on Tenerife. On February 26, Brewster informed the parents that due to the COVID-19 outbreak, Brewster would be evacuating the students from Tenerife and the students would return to the United States on Saturday, February 29.

Between February 26 (Wednesday) and the evening of February 28 (Friday), Brewster made no effort to ensure that students had their passports ready to travel. On Friday evening, Vilariño texted the students and asked each to respond with a photograph of their passport. At this point, Lydia could not locate her passport. When Lydia informed Vilariño that she could not locate her passport, he told Lydia that she could not fly back to the United States with Vilariño and the other students. Vilariño sent Lydia a text message with a "shoulder shrug emoji" and said: "It is what it is. Calm down, relax, there's nothing you can do about it now." Doc. no. 1 ¶ 31; see also doc. no. 1-1 at 3. Brewster did not inform Lydia where she would stay or who would supervise her if she could not travel to the United States with Vilariño and the other students.

On Saturday, February 29, Vilariño and the other students flew to Madrid. That same morning, Brewster explained to Lydia's parents that Brewster "left [Lydia] with her 2 Brewster teachers in charge of her." Doc. no. 1 ¶ 39. Although

4

Iglesias and Villaverde (the two other teachers) remained in Spain, neither called nor visited Lydia after she was left behind. One of them contacted Lydia once by text.[4]

Jane flew to Tenerife and arrived on Sunday, March 1, 2020. After obtaining an emergency passport for Lydia at the U.S. Embassy in Madrid, Lydia and Jane both returned to the United States. Once she returned to her family's home in Massachusetts, Lydia struggled with her mental health. Lydia refused to leave the house and slept in her mother's bedroom due to her anxiety. As a result of her anxiety and depressed mood, Lydia developed an eating disorder and was diagnosed with Bipolar II disorder and post-traumatic stress disorder. Lydia filed this lawsuit (at age nineteen) seeking relief for the injuries she alleges Brewster caused by leaving her behind in Tenerife at the beginning of the COVID-19 pandemic.

## DISCUSSION

Brewster moves to dismiss Lydia's claims, arguing that, by signing the Agreement, Lydia and Jane released Brewster from any liability for claims sounding in negligence arising out of Lydia's participation in the Program. The Agreement contains a section entitled "Waiver and Release," in which Lydia and Jane promised not to sue Brewster for "for any and all liability or claims" (with the exception of "claims for intentional wrongdoing") that are "related to [Lydia's]

---

[4] The complaint does not specify where Lydia stayed after Villariño and the other students left Tenerife. Nor does the complaint indicate where the remaining teachers stayed, which teacher texted her, or the content of the text message.

5

participation in the Trip or associated transportation or other loss during his/her time during the Trip."⁵ Doc. no. 6-1 at 6. Lydia contends that the release is unenforceable under New Hampshire law. Both parties concede the applicability of New Hampshire law.

New Hampshire generally disfavors exculpatory contracts. Barnes v. New Hampshire Karting Ass'n, Inc., 128 N.H. 102, 106 (1986). Nonetheless, exculpatory contracts are enforceable in some circumstances. See id. Typically, New Hampshire courts will uphold exculpatory contracts if: "(1) they do not violate public policy, (2) the plaintiff understood the import of the agreement or a reasonable person in his position would have understood the import of the agreement, and (3) the plaintiff's claims were within the contemplation of the parties when they executed the contract." McGrath v. SNH Dev. Inc., 158 N.H. 540, 542 (2009) (quoting Dean v. McDonald, 147 N.H. 263, 266 (2001)). The burden is on the party seeking to enforce a release to show that it meets these criteria. See Barnes, 128 N.H. at 106.

The parties' dispute in this matter turns on whether the release violates public policy. An exculpatory contract complies with public policy when "no special relationship existed between the parties and . . . there was no other disparity in bargaining power." Ladue v. Pla-Fit Health, LLC, 173 N.H. 630, 633 (2020) (quoting

---

⁵ There is also an "Indemnity" provision in which they promised to "indemnify (meaning to pay or reimburse on demand any amount incurred or required to be paid, including reasonable attorneys' fees and expenses) and hold the Released Parties harmless from all Claims," that arose from or related to Lydia's "participation in the Trip or associated activities and transportation, including claims that any Released Party was negligent." Doc. no. 6-1 at 6.

6

McGrath, 158 N.H. at 543). In addition, New Hampshire courts will find a contract against public policy where "it is injurious to the interests of the public, violates some public statute, or tends to interfere with the public welfare or safety." Id. (quoting McGrath, 158 N.H. at 543). Because Lydia argues only that a special relationship existed between herself and Brewster, the court does not consider whether the release may violate public policy on another basis.

A special relationship exists "[w]here the defendant is a common carrier, innkeeper or public utility, or is otherwise charged with a duty of public service." McGrath, 158 N.H. at 544 (quoting Barnes, 128 N.H. at 106). "A special relationship also exists if the defendant provides a service that is 'of great importance to the public,' or is 'a matter of practical necessity.'" Ladue, 173 N.H. at 634 (quoting Barnes, 128 N.H. at 108). "Additionally, a special relationship may exist when the plaintiff is both dependent on and legally compelled to use the defendant's services." Id. Due to the public importance and compulsory nature of education, the New Hampshire Supreme Court has held that schools have a special relationship with their students. See Marquay v. Eno, 139 N.H. 708, 717 (1995). The special relationship imposes a duty of reasonable supervision on schools. Id. The New Hampshire Supreme Court recently suggested that an exculpatory agreement between a student and her school may violate public policy because of their existing special relationship. Ladue v. Pla-Fit Health, LLC, 173 N.H 630, 634-35 (2020) (citing Marquay as an example of a scenario in which a special relationship between parties would make an exculpatory contract unenforceable).

7

Along with the compulsory and public character of education, the special relationship between schools and students exists because "[s]chool attendance impairs both the ability of students to protect themselves and the ability of their parents to protect them." Marquay, 139 N.H. at 717. "It is this impairment of protection from which the special relationship between school and student arises and from which the duty of supervision flows." Id. The duty applies to all employees tasked with "supervisory responsibility over students" who "thus have stepped into the role of parental proxy." Id. at 718. However, the duty imposed on schools covers only reasonably foreseeable risks. Id. at 717; Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 731 (2009).

Separate and apart from whether the release is unenforceable because of a special relationship between Lydia and Lovering, the parties' dispute implicates whether a parent has the authority to bind their minor child to an exculpatory agreement purporting to waive liability for an injury to the child before the injury has occurred.[6] While it does not appear that the New Hampshire Supreme Court has had occasion to consider this precise issue, the vast majority of states find such agreements unenforceable. See, e.g., Galloway v. State, 790 N.W.2d 252, 256 (Iowa 2010) (collecting cases); Kirton v. Fields, 997 So. 2d 349, 356 (Fla. 2008) (collecting cases); McKenna v. Am. Inst. for Foreign Study Scholarship Found., Civ. No. 94-

---

[6] Although Lydia also signed the Agreement herself, the parties do not dispute that, upon reaching the age of majority, Lydia could repudiate the agreement, and that she did so by timely initiating this lawsuit. The only dispute is whether Jane bound Lydia to the Agreement notwithstanding Lydia's repudiation of her own execution of the contract.

671-B, at 9 (D.N.H. Sept. 12, 1997) (Barbadoro, J.) (noting that "of those jurisdictions that have considered the issue, almost all have concluded that pre-injury releases signed by a parent do not bar a child's action for personal injury absent contrary statutory provisions").[7]

While the New Hampshire Supreme Court has not directly addressed the issue of pre-injury exculpatory contracts signed by parents on behalf of their minor children, the state's general policy toward the rights of minors indicates that it would not enforce such contracts. Although New Hampshire recognizes parents' rights to make decisions for their children, the state may limit this decision-making authority in some circumstances when doing so protects the welfare of children. See Preston v. Mercieri, 133 N.H. 36, 40 (1990).

The state protects the rights of children by—as a general rule—prohibiting parents from waiving the substantive rights of a minor. State ex rel. Fabian v. Fabian, 116 N.H. 516, 518 (1976). A minor's substantive rights can only be discharged through "a duly appointed guardian acting within his powers, or through his next friend by proceedings in court." Roberts v. Hillsborough Mills, 85 N.H. 517, 519 (1932). Thus, post-injury, New Hampshire generally bars parents from settling their minors' claims without court approval. RSA 464-A:42; see Roberts, 85 N.H. at 517 (holding mother had no right to bind minor son to post-injury workers' compensation agreement with son's employer).

---

[7] This order is attached to Lydia's objection to Brewster's motion to dismiss. See doc. no. 18-2.

9

Most states that ban post-injury settlements by parents also extend that ban to pre-injury releases. See, e.g., Scott ex rel. Scott v. Pac. W. Mountain Resort, 834 P.2d 6, 11-12 (1992) ("Since a parent generally may not release a child's cause of action after injury, it makes little, if any, sense to conclude a parent has the authority to release a child's cause of action prior to an injury."); see also McKenna, Civ. No. 94-671-B, at 8  (construing New Hampshire law and holding that "[s]ince a parent may not release a child's cause of action post-injury without court approval it makes little sense to conclude that the parent should have that authority before the injury occurs").

At least three trial court judges (two in New Hampshire and one in Massachusetts) have concluded that pre-injury exculpatory contracts signed by a parent on behalf of a minor child are unenforceable under New Hampshire law. See Perry v. SNH Dev., Inc.,[8] No. 226-2015-CV-00678, at 10-11 (N.H. Super. Ct. Sept. 13, 2017) (Temple, J.); Harrigan v. New Eng. Dragway, Inc., No. 13-10132-JCB, 2014 WL 12589625, at *7 (D. Mass. Jan. 2, 2014) (Boal, J.); McKenna, , at 9 . In this court, Judge Barbadoro held almost thirty years ago that a mother's pre-injury release of her son's negligence claims against an "au pair" company was unenforceable under New Hampshire law. McKenna, at 9. Judge Barbadoro based his holding on New Hampshire's prohibition on parents settling post-injury claims, its negative view of exculpatory agreements, and the weight of authority from other jurisdictions. See id.; see also Harrigan, 2014 WL 12589625, at *7 (holding that

---

[8] This order is also attached to Lydia's objection. See doc. no. 18-1.

10

New Hampshire would not enforce exculpatory agreements signed by parents on behalf of minors and permitting a child's negligence claim against a speedway to proceed); Perry, No. 226-2015-CV-00678, at 13 (permitting child's claims for injuries from ski lift accident to proceed despite existence of a parental waiver of child's claims against ski resort).

Some jurisdictions that generally ban exculpatory contracts signed by parents on behalf of children will enforce such contracts when the agreement concerns participation in the context of "commonplace child oriented community or school supported activities" run by non-profit or government organizations such as high school extracurricular activities or local recreational youth sports programs. Kelly v. United States, 809 F.Supp.2d 429, 437 (E.D.N.C. 2011) (quoting Gonzalez v. City of Coral Gables, 871 So.2d 1067, 1067 (Fla. Dist. Ct. App. 2004)) (upholding liability waiver for participation in high school Junior Reserve Officers' Training Corps program); see also Sharon v. City of Newton, 769 N.E.2d 738, 746-47 (Mass. 2002) (upholding liability waiver for participation in high school cheerleading team); Zivich v. Mentor Soccer Club, Inc., 696 N.E.2d 201, 207 (Ohio 1998) (upholding liability waiver for participation in non-profit recreational soccer league run mostly by volunteers).

However, not all states recognize this exception. See Childress ex rel. Childress v. Madison Cnty., 777 S.W.2d 1, 7-8 (Tenn. Ct. App. 1989) (refusing to enforce liability waiver for Special Olympics athletics program); Fedor v. Mauwehu Council, Boy Scouts of Am., Inc., 143 A.2d 466, 468 (Conn. Super. Ct. 1958)

11

(refusing to enforce liability waiver for camping trip organized by Boys Scouts of America); Galloway, 790 N.W.2d at 253, 258-59 (refusing to enforce liability waiver for field trip run by state university-sponsored educational program). The jurisdictions that do recognize this exception enforce the waivers to promote the availability of youth recreational and educational opportunities. Zivich, 696 N.E.2d at 205.

Here, the provisions of the Agreement releasing Brewster from liability violate New Hampshire public policy, and are thus unenforceable, for two separate reasons: (1) there was a special relationship between Lydia and Brewster and (2) Jane lacked authority to waive Lydia's claims.

I. <u>The Special Relationship Between Brewster and Lydia Renders Unenforceable the Releases in the Agreement</u>

Although Brewster is a private boarding school, by educating children Brewster takes on "a duty of public service." McGrath, 158 N.H. at 544 (quoting Barnes, 128 N.H. at 106). Thus, like all schools in New Hampshire, Brewster has a special relationship with its students. See Marquay, 139 N.H. at 717. This special relationship imposed on Brewster a duty to reasonably supervise its students. Id. Lydia was a Brewster student when she signed the Agreement and remained a Brewster student throughout the events in Tenerife. Therefore, a special relationship existed between Lydia and Brewster. See id. This special relationship makes the exculpatory provisions of the Agreement between them unenforceable under New Hampshire law. See Barnes 128 N.H. at 106; Ladue, 173 N.H at 634-35.

Brewster argues that no special relationship with Lydia existed because the Program was not compulsory. Although the compulsory nature of education is one reason New Hampshire law recognizes a special relationship between schools and students, the New Hampshire Supreme Court has explained that the special relationship arises from the "impairment of protection" that occurs when schools separate children from their parents. Marquay, 139 N.H. at 717. The "impairment of protection" that concerned the New Hampshire Supreme Court in Marquay is more pronounced in a school program such as this, where the Program separates parents and children across international borders. Lydia and her parents depended on Brewster to supervise Lydia while in Tenerife. Brewster therefore had the type of special relationship with Lydia that precludes it from relying on an exculpatory contract to avoid its liability for acting negligently while entrusted with her care abroad.

Brewster also argues that no special relationship existed because the school's duty to supervise only extends to reasonably foreseeable risks. Brewster contends that the risk of Lydia losing her passport was not reasonably foreseeable. While foreseeability does limit the "scope of the duty imposed" by the special relationship between schools and students, foreseeability is not dispositive on the question of whether a special relationship exists. See Marquay, 139 N.H. at 717. And even if reasonable foreseeability did determine the existence of a special relationship, a student losing their passport is a reasonably foreseeable risk of traveling to a foreign country with minors. Indeed, Brewster's request for photocopies of students'

13

passports prior to the trip indicates that Brewster may have foreseen this risk. In sum, because of the special relationship between Brewster and Lydia, the releases in the Agreement are unenforceable under New Hampshire law.

II. The Releases in the Agreement Are Unenforceable Because Lydia's Mother Lacks Authority to Waive Lydia's Legal Rights

The releases in the Agreement are invalid for an additional reason. They are unenforceable under New Hampshire law because an exculpatory contract signed by a parent on behalf of a minor child violates public policy. Under New Hampshire law, Jane did not have the authority to waive Lydia's substantive rights. See Fabian, 116 N.H. at 518; Roberts, 85 N.H. at 517. As Judges Barbadoro, Boal, and Temple have persuasively concluded, pre-injury exculpatory agreements signed by a parent on behalf of a minor child, such as the Agreement in this case, are unenforceable under New Hampshire law for four main reasons: the state's negative view of exculpatory agreements, the state's interest in protecting child welfare, the existing ban on waiving a minor's claims post-injury, and the weight of authority in other jurisdictions. See McKenna, doc. no. 18-2, at 9; Perry, doc. no. 18-1, at 13; Harrigan, 2014 WL 12589625, at *7.

Brewster argues that the releases in the Agreement are nonetheless enforceable under an exception for non-profit organizations. See Kelly, 809 F. Supp. 2d at 436-37; Sharon, 769 N.E.2d at 747; Zivich, 696 N.E.2d at 207. But see, e.g., Childress, 777 S.W.2d at 7-8 (refusing to recognize this exception); Fedor, 143 A.2d at 468 (same); Galloway, 790 N.W.2d at 256 (same). "Although the majority rule is

14

that parents may not bind their children to pre-injury liability waivers," Kelly, 809 F. Supp. 2d at 436, Brewster is correct that "many states recognize an exception where the liability waiver is in the context of non-profit activities sponsored by schools, volunteers, or community organizations," id.

However, even if New Hampshire were to recognize this exception, it would not apply here. The purpose of the exception is to protect—from the financial burden of liability—non-profit and governmental organizations that provide activities for children in the community. Zivich, 696 N.E.2d at 205. The Program does not qualify as the kind of "commonplace child oriented activity" that the exception is aimed at protecting. Kelly, 809 F. Supp. 2d at 437 (quoting Gonzalez, 871 So. 2d at 1067). Unlike a youth athletics team or volunteer-run extracurricular activity, a study abroad program is not a common experience offered to children. Cf. Kelly, 809 F. Supp. 2d at 437; Sharon, 769 N.E.2d at 747; Zivich, 696 N.E.2d at 207. Imposing liability on Brewster will not adversely affect the availability of commonplace youth recreational programs in New Hampshire. Cf. Galloway, 790 N.W.2d at 256 (finding unenforceable a release concerning educational field trip sponsored by public university and noting "[w]e find no reason to believe opportunities for recreational, cultural, and educational activities for youths have been significantly compromised in the many jurisdictions [imposing liability]"). Thus, even if New Hampshire recognized this exception, it would not apply here.

## CONCLUSION

For the above reasons, the court denies Brewster Academy's motion to dismiss (doc. no. 5).

SO ORDERED.

_____
Landya McCafferty
United States District Judge

August 28, 2024

cc:    Counsel of Record

16